Filed 11/23/22 Kaplan v. Gimelstob CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RANDALL KAPLAN,<br><br>    Cross-Complainant and Respondent,<br><br>    v.<br><br>JUSTIN GIMELSTOB,<br><br>    Cross-Defendant and Appellant. | B315197<br><br>(Los Angeles County Super. Ct. No. 19STCV19647) |

APPEAL from an order of the Superior Court of Los Angeles County, Kevin C. Brazile, Judge. Affirmed with directions.

Vedder Price, Eric R. McDonough, Deborah A. Hedley, Lauren E. Wertheimer; and Robert M. Dato for Cross-Defendant and Appellant.

Gordon Rees Scully Mansukhani, Matthew G. Kleiner, Norvik Azarian, and Scott W. McCaskill for Cross-Complainant and Respondent.

\* \* \* \* \* \*

In a display that a trial court characterized as "junior high and high school" conduct, two wealthy, middle-aged men—one a former professional athlete and the other a venture capitalist—got into a fistfight while trick or treating with their families on Halloween night 2018. The men have now moved their spat into the court system. After the ex-athlete pled no contest to felony assault, he went on a podcast to claim that *he* was the victim of an attack "initiated" by the venture capitalist, that he had entered the plea because the criminal court system was rigged, and the venture capitalist was conspiring with the ex-athlete's ex-wife to manipulate the family court to get her custody of the child the ex-athlete had with her. After the venture capitalist sued the ex-athlete for slander for his remarks on the podcast, the ex-athlete filed a motion to strike the slander claim under our State's anti-SLAPP law (Code Civ. Proc., § 425.16).[1] The trial court denied the motion, thereby allowing the slander claim to move forward. The ex-athlete challenges that ruling. Many of his arguments reflect a fundamental misunderstanding of how the anti-SLAPP law works. All of his arguments are also

---

1    "SLAPP" is short for Strategy Lawsuit Against Public Participation.

meritless. Thus, we largely affirm, but elect to strike certain allegations from the slander claim despite the ex-athlete's failure to ask the trial court for such relief.

## FACTS AND PROCEDURAL BACKGROUND

I. Facts

A. *The parties*

Justin Gimelstob (Gimelstob) was a professional tennis player until he retired in 2007. Since then, he has coached other players as well as, in his own words, worked as a "broadcaster, producer, talent representative, and brand ambassador."

Randall Kaplan (Kaplan) is a "venture capitalist."

Gimelstob and Kaplan were friends for a while, but their relationship soured when Kaplan got upset because Gimelstob did not show up to his birthday party.

B. *The Halloween 2018 incident*[2]

On Halloween night in 2018, both Gimelstob and Kaplan were out trick or treating in Brentwood, which is an upscale neighborhood on the west side of Los Angeles, California. Kaplan was with his wife and their two-year-old daughter; Gimelstob, with his girlfriend and his five-year-old son. Gimelstob was dressed up as "Maverick" from *Top Gun*.

As Kaplan's wife and child were watching, Gimelstob "ambushed" Kaplan from behind and—"unprovoked and entirely without warning"—knocked Kaplan to the ground. Gimelstob mounted Kaplan's prone body, and proceeded to punch him 50 to 100 times. The attack lasted three minutes and ended only when a passerby pulled Gimelstob off of Kaplan.

---

[2] Consistent with the applicable standard of review governing anti-SLAPP motions, we set forth these facts in the light most favorable to Kaplan, as the nonmoving party.

## C.    *Gimelstob's criminal plea*

The Los Angeles County District Attorney charged Gimelstob with committing a battery inflicting serious bodily injury, which is a crime that can be charged as a felony or a misdemeanor.  (Pen. Code, § 243, subd. (d).)  The District Attorney charged it as a felony.

After the trial court expressed its tentative inclination to reduce the offense to a misdemeanor if Gimelstob entered a plea to the charge as a felony, the court allowed Kaplan and Kaplan's wife to read their victim impact statements to the court.  While Kaplan was speaking, Gimelstob repeatedly shook his head and said "not true," made facial expressions and otherwise engaged in "demonstration[s] of frustration," tried to get the trial court judge's attention, and glanced back at the press assembled in the courtroom gallery.  Given what the trial court perceived to be petulant and sophomoric antics by Gimelstob while Kaplan spoke, the court expressed concern that Gimelstob did not really want to accept responsibility for the charged crime and might be better suited to proceed to trial on the felony battery charge.  After Gimelstob assured the court that he wanted to accept responsibility for the crime, Gimelstob entered a no contest plea to the battery crime as a felony.  Consistent with its prior indication, the trial court then reduced the felony to a misdemeanor, and placed Gimelstob on probation for three years; as conditions of probation, Gimelstob was ordered to complete 60 days of community labor and take a one-year anger management course.  Gimelstob thereafter was ordered to pay Kaplan $15,204.42 in restitution, which was comprised of $268 to replace the clothing Kaplan was wearing during the incident, $875 for

4

medical expenses, $2,325 for physical therapy, and the remainder for mental health therapy.

### D. *The January 2019 podcast*

On January 19, 2021, Gimelstob appeared on a tennis-focused podcast entitled "Control the Controllables," which was hosted by Dan Kiernan. The host asked Gimelstob for "the truth" about the Halloween 2018 incident. In response, Gimelstob stated:

- He "neither provoked [n]or initiated any incident that evening," either "verbally or physically." According to Gimelstob, it was Kaplan who "initiated physical contact," and only after Kaplan "engaged and initiated" did Gimelstob lose "restraint." Consistent with Kaplan being the aggressor and assailant, Gimelstob stated that there was "absolutely not 100ths of the damage" Kaplan had reported suffering; this was confirmed, Gimelstob pointed out, by the police report, in which the police had checked a box indicating "no physical damage." Gimelstob nevertheless bragged—not once, but twice—that he "got the better" of Kaplan in the fight. Gimelstob characterized his plea to the felony battery crime as the "legal system" "[u]nfortunately" "hav[ing] its blind spots," including Marsy's Law allowing "a victim . . . to say whatever they want."

- Kaplan had "threatened to help [Gimelstob's] ex-wife take custody of [his] son," which included "l[ying]" and "misrepresenting" the truth about the altercation as part of their joint "mission to manipulate . . . the legal process."

Gimelstob lamented that he had "lost everything" due to the Halloween 2018 incident and its fallout, but said, "you know what? It just makes for a better comeback."

## II. Procedural Background

### A. *Pleadings*

Kaplan's wife sued Gimelstob for (1) intentional infliction of emotional distress, (2) negligent infliction of emotional distress, and (3) loss of consortium.

Gimelstob filed a cross-complaint against Kaplan. In the operative first amended cross-complaint, Gimelstob sued Kaplan for (1) assault (on Halloween 2018), (2) battery (on Halloween 2018), (3) equitable indemnity (to reimburse Gimelstob for any judgment Kaplan's wife obtains against him), (4) abuse of process, (5) intentional interference with contractual relations (with all of Gimelstob's postretirement activities), and (6) intentional interference with a prospective economic advantage (with other possible postretirement activities that had not yet ripened into contracts). Gimelstob seeks actual damages and punitive damages.

Kaplan then filed a cross-claim against Gimelstob for (1) assault, (2) battery, and (3) slander per se. Kaplan also named the podcast host and the host's businesses as defendants to the slander claim. With regard to his slander claim, Kaplan alleged that:

- Gimelstob had falsely accused Kaplan "of committing an assault upon him" on Halloween 2018, while falsely denying that Gimelstob was responsible for the attack and that Kaplan had "suffered any injuries in the assault."

- Gimelstob had "falsely accused Kaplan of conspiring with Gimelstob's ex-wife to 'manipulate the legal process' to damage Gimelstob."

6

● Gimelstob had falsely said that Kaplan had told Gimelstob, on Halloween 2018, that Gimelstob's recently deceased father was an "asshole."

As part of his slander claim, Kaplan alleged that Gimelstob's statements did "damage to [his] business reputation and damage to [his] personal reputation in the community," and also "imput[ed to Kaplan] criminal conduct."

**B.     *Gimelstob's anti-SLAPP motion***

Gimelstob filed an anti-SLAPP motion to strike *the entirety* of Kaplan's slander per se claim. In support of his motion, Gimelstob submitted declaration and deposition testimony (given in Gimelstob's dissolution case) from himself, from his girlfriend, and from Kaplan's former housekeeper. This testimony paints a very different picture of what happened on Halloween 2018: Kaplan approached Gimelstob, and told him, "I heard your dad just dropped dead and he was an even bigger asshole than you." Shocked and angry, Gimelstob asked Kaplan, "What the fuck is wrong with you?" After Kaplan walked away, Gimelstob ran to catch up to Kaplan and demanded to know, "What is your fucking problem with me?" When Kaplan responded, "Fuck you" and pushed Gimelstob "hard in the chest," Gimelstob responded by "clotheslin[ing]" Kaplan with his "left arm" and thereby knocking Kaplan down to the grass, where the two got into a "wrestling scrap" as Gimelstob sat astride Kaplan "swinging" his fists for 20 to 30 seconds. In support of his motion, Gimelstob also included the police report from the incident. Although the report noted that Gimelstob had "approached victim from behind, [and] punched [him]," the reporting officer also checked the box for "no serious injury to victim."

7

Kaplan opposed the motion. In support of the opposition, Kaplan submitted a declaration laying out his version of what happened during the Halloween 2018 incident (and his wife submitted a similar declaration), as well as the fact that he had spoken with Gimelstob's ex-wife only on the night of the incident as well as once before in the prior five years; on neither occasion, Kaplan attested, had he "coordinate[d] or conspire[d]" with her "to help her custody case or cause harm to" Gimelstob.

Following Gimelstob's filing of a reply, the parties' filing of objections to one another's evidence, and a hearing, the trial court issued a ruling denying Gimelstob's anti-SLAPP motion. The court found that Gimelstob's statements on the podcast constituted "protected activity" under the anti-SLAPP statute because Gimelstob is a "person . . . in the public eye" and because the Halloween 2018 incident itself "was [a] subject [of] media attention." The court also found that Kaplan had carried his burden of showing that his slander per se claim had the minimal merit necessary to withstand dismissal under the anti-SLAPP statute.

C. *Appeal*

Gimelstob filed this timely appeal of the trial court's anti-SLAPP ruling.

## DISCUSSION

Gimelstob argues that the trial court erred in denying his anti-SLAPP motion to strike Kaplan's slander per se claim. We independently review the denial of an anti-SLAPP motion. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325-326; *Bowen v. Lin* (2022) 80 Cal.App.5th 155, 161.) Because our task is to review the trial court's ruling and not its reasoning (*People v. Zapien* (1993) 4 Cal.4th 929, 976; *Musgrove v. Silver* (2022) 82

8

Cal.App.5th 694, 704, fn. 4), we need not consider Gimelstob's attacks on the trial court's reasoning.

## I.    Law, Generally

### A.    *The anti-SLAPP statute*

The anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Specifically, the anti-SLAPP statute protects—and thus "subject[s] to a motion to strike"—any "cause of action . . . arising from any act of [a] person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (Code Civ. Proc., § 425.16, subd. (b)(1).)

When a party moves to strike a cause of action (or specific allegations within that cause of action) under the anti-SLAPP statute, a trial court has two tasks. (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321 (*Barry*).)  First, the court must evaluate whether the moving party has "made a threshold showing that the challenged cause of action arises from protected activity." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Second, and only if the court concludes that the moving party has made this "threshold showing," the court must examine whether the nonmoving party has "established . . . a probability that [he] will prevail on the [challenged cause of action]."  (Code Civ. Proc., § 425.16, subd. (b)(1); see *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820 (*Oasis West*).)  That burden is met if the nonmoving party demonstrates that the challenged cause of action has "minimal merit" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94), and he does so by making a "prima facie factual showing"—based on admissible evidence—"sufficient to sustain a

favorable judgment" on that cause of action (*Baral, supra,* 1 Cal.5th at pp. 384-385; *Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 124.)  In assessing the sufficiency of this showing, a court is to "consider the pleadings, and supporting and opposing affidavits" (Code Civ. Proc., § 425.16, subd. (b)(2)), but must """accept as true the evidence favorable to the [nonmoving party] and evaluate the [moving party's] evidence only to determine if it has defeated that submitted by the [nonmoving party] as a matter of law.""" (*Oasis West*, at p. 820.) Thus, a court is generally not to make credibility determinations or otherwise weigh the evidence submitted. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906; *Ross v. Kish* (2006) 145 Cal.App.4th 188, 197.)  If the nonmoving party satisfies its burden, the anti-SLAPP motion must be denied; if it fails to do so, the pertinent cause of action must be stricken. (*Barry*, at p. 321.)

### B. *Slander and slander per se*

Slander is a species of defamation.  (Civ. Code, § 44.)[3]  To prove a claim for slander, a plaintiff must prove (1) a publication (2) that was false, (3) that was unprivileged, and (4) that either (a) has a "natural tendency to injure" *or* (b) "causes special damage." (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 888; *Gonzalez v. Fire Ins. Exchange* (2015) 234 Cal.App.4th 1220, 1240, fn. 5; *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 867.)  If the statement has a "natural tendency" to injure (that is, to be defamatory), it is slander per se and the plaintiff need not prove any special damages flowing from the false publication. (*Regalia v. The Nethercutt Collection* (2009)

---

[3]    All further statutory references are to the Civil Code unless otherwise indicated.

10

172 Cal.App.4th 361, 367; *Albertini v. Schaefer* (1979) 97 Cal.App.3d 822, 829 (*Albertini*).)

Section 46 delineates four categories of slander per se, two of which are relevant to this case—namely, a statement that either (1) "[c]harges any person with a crime, or with having been indicted, convicted, or punished for a crime" (§ 46, subd. (1)), or (2) "[t]ends directly to injure [a person] in respect to his office, profession, trade or business, either [(a)] by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or [(b)] by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits" (*id.*, subd. (3)).  As section 46's separation of these categories into different subdivisions separate by the word "or" confirms (§ 46), these categories are *independent* of one another; contrary to what Gimelstob urged during oral argument, a plaintiff who shows that a statement charges someone with a crime under subdivision (1) of section 46 does not *also* have to show injury to reputation under subdivision (3) of section 46.

In assessing whether a particular statement falls into a category of slander per se, a court is to consider the speaker's statement "in its entirety" rather than "divide[] [it] into segments," and is also to focus on the "'natural and probable effect upon the mind of the average' listener" rather than engage in a "critical analysis of a mind trained in the law." (*Correia v. Santos* (1961) 191 Cal.App.2d 844, 851 (*Correia*); accord, *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261; *Stevens v. Storke* (1923) 191 Cal. 329, 334.)  With this standard, a defendant accordingly is liable not only for what he states

explicitly, but also for what he insinuates. (*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547.)

## II.    Analysis

On appeal, neither party challenges the trial court's finding that Gimelstob's podcast statements constitute "protected activity" under the anti-SLAPP statute. Thus, the propriety of the trial court's ruling turns on whether Kaplan established that his slander per se claim has minimal merit. The parties are in agreement that Kaplan did not carry his burden with respect to three statements alleged in Kaplan's cross-complaint but not made by Gimelstob during the podcast—namely, that (1) Kaplan said he was "glad" that Gimelstob's father passed away, (2) that Kaplan said Gimelstob's father was an "asshole," and (3) that Kaplan said Gimelstob's father was "a bigger asshole than" Gimelstob. The trial court did not strike these statements because Gimelstob's anti-SLAPP motion only sought to strike the slander per se claim *in its entirety;* on our de novo review, we will overlook Gimelstob's procedural blunder and strike these individual allegations from Kaplan's complaint because they were never published in an unprivileged manner. Thus, we are left to examine two statements made by Gimselstob during the podcast—namely, (1) Gimelstob's statements accusing Kaplan of "committing an assault upon him" on Halloween 2018, and (2) Gimelstob's statements that Kaplan was "conspiring with Gimelstob's ex-wife to manipulate the legal process" in Gimelstob's ongoing custody battle with his ex-wife.

On appeal, Gimelstob raises what boils down to three reasons why Kaplan did not establish minimal merit to his slander per se claim based on these statements—namely, that (1) they do not qualify as slander per se (and thus fail because

12

Kaplan did not otherwise establish any special damages), (2) they are privileged by the litigation privilege (§ 47, subd. (b)), and (3) they are not false.

### A. *Slander per se*

Both statements made by Gimelstob on the podcast qualify as slander per se because they "[c]harge[]" Kaplan "with [a] crime." (§ 46, subd. (1).) Although it "must be appear from the [speaker's] words themselves . . . that the [speaker has] charged the plaintiff with a crime" (*Haub v. Freiermuth* (1905) 1 Cal.App. 556, 557), "it is not necessary that the language used should be chosen with the technical nicety required in an indictment" (*Carl v. McDougal* (1919) 43 Cal.App. 279, 281 (*Carl*)). Thus, a speaker charges another with a crime if he accuses him of being a "thief" (*Albertini*, *supra*, 97 Cal.App.3d at pp. 829-830), of being a "lockbreaker" (*Leaper v. Grandy* (1937) 22 Cal.App.2d 475, 477), of taking money not belonging to him (*Douglas v. Janis* (1974) 43 Cal.App.3d 931, 940), of forging a check (*Carl*, at p. 281), or of belonging to a criminal organization like the mafia (*Arno v. Stewart* (1966) 245 Cal.App.2d 955, 960-961).

This standard is met here.

With regard to the Halloween 2018 incident, Gimelstob stated that *he* "neither provoked nor initiated" and it was *Kaplan* who "initiated physical contact," and that it came to blows that Kaplan exaggerated. Because the only other participant in the melee was Kaplan, Gimelstob's statements insinuated that *Kaplan* provoked and initiated a "fight" that involved an exchange of punches. The conduct Gimelstob attributes to Kaplan constitutes both an assault and a battery. (See Pen. Code, § 240 [assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of

13

another"], § 242 [battery is "any willful and unlawful use of force or violence upon the person of another"].) Gimelstob contends that he never used the words "assault" or "battery" and only accused Kaplan of "initiat[ing] physical contact," but this contention ignores the context of his statement and rests upon precisely the type of "'hair-splitting analysis of language'" that the courts have rejected. (*Correia*, *supra*, 191 Cal.App.2d at p. 851.)

With regard to Kaplan's coordination with Gimelstob's ex-wife, Gimelstob stated that the two were on a "mission to manipulate . . . the legal process," including through "l[ying]" and "misrepresent[ation]," to obtain a court order granting "custody of [Gimelstob's] son" to his ex-wife. This constitutes the crime of "conspir[ing]" to "[f]alsely . . . maintain any suit, action, or proceeding." (Pen. Code, § 182, subd. (a)(3).)

\* \* \*

In light of our analysis, we have no occasion to decide whether Gimelstob's statements are slander per se for the additional reason that they impugned his professional reputation under subdivision (3) of section 46.

### B. *Litigation privilege*

Because slander does not reach "privileged" statements (§ 46), a person's statements that fall within the so-called "litigation privilege" are not actionable. The litigation privilege applies to any communication made in a judicial or quasi-judicial proceeding that (1) is made by authorized participants, (2) is made to achieve the objects of litigation, and (3) has a logical connection to the action. (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212; *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241.)

14

Gimelstob's statements regarding the Halloween 2018 incident and Kaplan's alleged conspiracy with his ex-wife are not covered by the litigation privilege because Gimelstob published those statements during a podcast wholly divorced from any litigation. Gimelstob argues that he more explicitly accused Kaplan of committing an assault and battery in his cross-complaint. This is true, but utterly irrelevant because, for the reasons discussed above, Gimelstob's earlier statements on the podcast sufficiently charge Kaplan with crimes, such that Kaplan's slander per se claim rests on Gimelstob's unprivileged podcast statements. It goes without saying that a person cannot convert an unprivileged statement into a privileged one (and thereby immunize himself from liability for defamation) merely by repeating that statement in subsequent litigation.

### C.    *Falsity*

Kaplan also made a prima facie factual showing that Gimelstob's statements on the podcast were false. (Civ. Code, § 46.) Both Kaplan and his wife offered declarations recounting that Kaplan did not assault or batter Gimelstob; rather, they declared, it was *Gimelstob* who engaged in an "unprovoked attack" by "ambushing" Kaplan from behind and without any prior "interaction or discussion" between the two men. Kaplan also declared that he did not "coordinate or conspire" with Gimelstob's ex-wife "to help her custody case or to cause harm to Gimelstob," and only contacted the ex-wife on the night of the assault "to obtain information relative to Gimelstob's whereabouts and state of mind," such as whether he possessed a gun.

15

Gimelstob offers three reasons why, in his view, Kaplan did not make a prima facie showing of the falsity of Gimelstob's podcast statements.

First, he asserts that Kaplan's "self-serving" declaration cannot be credited. This argument has the applicable standard of review backwards. As explained above, we must construe the evidence in the light most favorable to the nonmoving party (here, Kaplan)—not, as Gimelstob seems to suggest, construe it in the light *least* favorable to Kaplan.

Second, Gimelstob asserts that the trial court erred in relying on his misdemeanor conviction as tending to prove that Gimelstob's denial of responsibility for the Halloween 2018 incident was false. This assertion is triply irrelevant. It is irrelevant because our task is to review the trial court's ruling, not its reasoning. It is irrelevant because the declarations of Kaplan and his wife are sufficient *on their own* to make a prima facie showing that Gimelstob's statements were false. And it is irrelevant because the cases Gimelstob cites chiefly deal with whether a prior plea is a binding admission of the underlying conduct in a subsequent civil case, but the issue here is whether Kaplan has shown his slander per se claim to have *minimal* merit—not *conclusive* merit.

Finally, Gimelstob asserts that the evidence he submitted in support of his anti-SLAPP motion corroborates his version of the events that took place on Halloween in 2018 and negates Kaplan's evidence of falsity. This argument once again misunderstands the principles applicable to an anti-SLAPP motion. Kaplan only needed to show that the claim has "minimal merit" (*Baral*, *supra*, 1 Cal.5th at pp. 384-385), and this standard views the evidence through a prism friendly to the

plaintiff/nonmoving party. Because the conflicting evidence Gimelstob offers does not defeat Kaplan's evidence ""'as a matter of law'"" (*Oasis*, *supra*, 51 Cal.4th at p. 820), Gimelstob is at bottom asking us to reweigh the evidence in a light more favorable to him; this we cannot do. (*Baral*, at p. 384.)

## DISPOSITION

The order denying Gimelstob's anti-SLAPP motion is affirmed with directions for the trial court to strike those allegations in paragraphs 17 and 32 of Kaplan's cross-complaint regarding Gimelstob's accusation that Kaplan disparaged his father. The parties are to bear their own costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:


_____, Acting P. J.
CHAVEZ


_____, J.*
BENKE

---

\* Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17